UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WILBUR-ELLIS COMPANY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN ERIKSON and J.R. SIMPLOT COMPANY,<br><br>Defendants. | 4:23-CV-04058-LLP<br><br>MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION |

Plaintiff, Wilbur-Ellis Company, LLC, Inc., ("Wilbur-Ellis"), brought this action against Defendants, Kevin Erikson. ("Erikson") and J.R. Simplot Company ("Simplot") pursuant to an Employment Agreement ("Agreement") between Wilbur-Ellis and Erikson. The term of the Agreement was from April 1, 2015 to March 31, 2019. Erikson continued to work as an at-will employee with Wilbur-Ellis after the Agreement expired. Erikson voluntarily resigned from Wilbur-Ellis on March 20, 2023, and began work with Simplot.

On April 19, 2023, Wilbur-Ellis sued Erikson and Simplot in a six-count complaint. (Doc. 1.) In addition to requesting money damages, Wilbur-Ellis seeks a temporary and a permanent injunction prohibiting Erikson from violating restrictive covenants in the Agreement, prohibiting Simplot from tortiously interfering with contractual rights pursuant to the Agreement, and prohibiting both Defendants from misappropriating trade secrets. (Doc. 1, p. 39-40.) On April 20, 2023, Wilbur-Ellis filed a motion for preliminary injunction or, in the alternative, temporary restraining order. (Doc. 4.)

The Court held a hearing on the motion for temporary restraining order ("TRO") on May 9, 2023. The parties presented evidence and argument regarding the Restrictive Covenants at the hearing. The Court reserved ruling on the request for a TRO and scheduled a hearing on the motion for a preliminary injunction for June 1, 2023. After the May 9 hearing the parties submitted briefs on the dispositive issue of law - - whether the Restrictive Covenants survive after the Agreement terminated.

On May 18, 2023, the parties filed a Stipulation in which they agreed the hearing on the motion for preliminary injunction scheduled for June 1, 2023, should be cancelled. (Doc. 40.) The parties asked the Court to characterize its ruling on the motion for a TRO as the ruling on the motion for a preliminary injunction. (*Id.*) That request was granted, and the hearing was cancelled. (Doc. 41.)

Although Wilbur-Ellis's motion for a preliminary injunction is based upon additional legal theories, it has indicated that it seeks an injunction mainly based upon Erikson's alleged breach of the non-compete and non-solicitation provisions in the Agreement (collectively "Restrictive Covenants"). Erikson has agreed to abide by his "common law obligations to protect any confidential information." (Doc. 25, p. 12.)

After carefully considering the parties arguments and the terms of the Agreement, the Court grants Wilbur-Ellis's motion for a preliminary injunction for the reasons set forth below.

## BACKGROUND

Wilbur-Ellis is a limited liability company with its principal place of business in San Francisco, California, but Wilbur-Ellis does business throughout the United States, including South Dakota. (Doc. 1, Complaint, ¶¶ 1, 13, 15.) Wilbur-Ellis is an international marketer, distributor and provider of agricultural chemicals, fertilizer, seed, and related agronomic products, services, and technologies. (*Id.*, ¶ 13.) The company employs a team of Sales Agronomists to provide farmers with products and professional agronomic recommendations. (*Id.*, ¶ 15.) The Sales Agronomists work with farmers to identify the mix of fertilizers, herbicides, fungicides, and other applications to maximize crop yield (and minimize risk to crops) at the customer's farm. (*Id.*, ¶ 17.) Wilbur-Ellis then sells the agricultural products to the farmer. (*Id.*)

Erikson, a South Dakota resident, worked first as a sales representative and then as a Lead Sales Agronomist for Wilbur-Ellis until his voluntary resignation on March 20, 2023. On April 1, 2015, Erikson signed an Employment Agreement ("Agreement") with Wilbur-Ellis. A copy of the Agreement is attached as Exhibit A to the Complaint. (Doc. 1-1.)

The Agreement contains three provisions that are relevant to the breach of Employment Agreement allegations in Count 1 of the Complaint. The first is the Agreement's definition of its term:

> Term. The term of this Agreement shall commence on the Effective Date and, unless otherwise terminated prior to such time, shall terminate at the close of business on [March 31], 2019 (the "Term"). Thereafter, the employment of the Employee by the Employer shall continue at will, and either party may terminate the Employee's employment upon written notice of such termination by either party according to Employer's standard practices. . . .

(Doc. 1-1, ¶ 2.)

The second provision is a covenant not to compete and a non-solicitation provision in paragraph 5 of the Employment Agreement:

> Covenant Not to Compete; Non-Solicitation. Employee covenants and agrees that he will not, (i) anywhere, at any time during his employment, and (ii) within McCook County, South Dakota, and within a 100 mile radius of such county, for a period of two (2) years following the termination of his employment (whether terminated by Employer or Employee), directly or indirectly: (a) engage in any business engaged in the marketing, distribution, sale or application (or any segment thereof) of agricultural chemicals, fertilizers, seeds and related products (the "Competitive Business"), whether such engagement shall be as an owner, partner, employee, agent, consultant, or shareholder (except as the holder of not more than five percent (5%) of the outstanding shares of a corporation whose stock is listed on any national or regional securities exchange or any successor thereto) or in any other capacity; (b) solicit, divert or accept business from or otherwise take away or interfere with any customer of Employer or its affiliates or subsidiaries engaged in any Competitive Business, including without limitation, any person who was a customer of, or whose business was being pursued by, Employer in the conduct of its business prior to the date hereof; or (c) solicit the employment of any person employed by Employer or its affiliates or subsidiaries.

(Doc. 1-1, ¶ 5.)

The third relevant provision is a survival clause in paragraph 21 of the Agreement which states:

> Entire Agreement and Survival. This Agreement represents the entire agreement and understanding of the parties with reference to the subject matter set forth herein and it supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter of this Agreement. For the avoidance of doubt, the expiration or termination of this Agreement shall not be deemed a release or termination of any obligations of Employee, or rights of Employer, to the extent such obligations or rights, as the case may be, expressly survive the termination of this Agreement.

(Doc. 1-1, ¶ 21.)

Erikson resigned employment at Wilbur-Ellis on March 20, 2023. He went to work for Simplot, a direct competitor of Wilbur-Ellis. Simplot, an Idaho company with its principal place of business in Boise, Idaho, is a nationwide food and agribusiness company that provides plant nutrition and food processing services, services farmers, and sells seeds and other services for crop growth and production. (Doc. 1, ¶¶ 3, 8, 49.) Simplot does business in South Dakota. (*Id.*) Erikson admitted during the May 9, 2023 hearing that he is soliciting Wilbur-Ellis customers and conducting business in the area that the Employment Agreement has defined as the restricted territory.

Wilbur-Ellis brought this action on April 19, 2023, stating that diversity jurisdiction exists pursuant to 28 U.S.C. §§ 1332. (Doc. 1, ¶ 5.) Wilbur-Ellis asserts six counts in its Complaint. The Breach of Employment Agreement claim in Count 1 alleges that Erikson breached the Agreement's covenant not to compete, non-solicitation provision, and confidentiality clause. (Doc. 1, ¶¶ 65, 66, 67.) In Counts 2 and 3 of the Complaint, Wilbur-Ellis asserts that Simplot and Erikson misappropriated Wilbur-Ellis's trade secrets. Count 4 of the Complaint is a claim against Erikson for tortious interference with Wilbur-Ellis's contractual relationships with its customers, dealers, and business partners. In Count 5, Wilbur-Ellis contends that Simplot interfered with its contractual relationship with Erikson by hiring and continuing to employ Erikson. Count 6 is a breach of duty of loyalty claim against Erikson.

## LEGAL STANDARD

Wilbur-Ellis seeks an injunction under Federal Rule of Civil Procedure 65(a). (Doc. 4, p. 5.) The Court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Ultimately, a court "has broad discretion when ruling on requests for preliminary injunctions." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. As the party seeking injunctive relief, Wilbur-Ellis bears the burden of showing that

these factors support the issuance of a preliminary injunction. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

The crux of the issue before the Court is whether Wilbur-Ellis is likely to succeed on the merits of its breach of contract claim against Erikson. *See* Doc. 36, Wilbur-Ellis's Supplemental Memorandum of Law, p. 1 (stating "the only question before the Court is whether Erikson remained bound by the Restrictive Covenants after the expiration of the Term of the Agreement"); Doc. 37, Simplot's Supplemental Brief Regarding Likelihood of Success, p. 1 fn.1 (stating that, "[a]t least at this stage in the proceedings, the likelihood of success on the merits for both of these claims primarily turns on whether the Restrictive Covenants can be enforced against Erikson after his employment ended on March 20, 2023").

### A. Likelihood of Success on the Merits

The likelihood of success on the merits is the most important *Dataphase* factor. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted). When assessing the likelihood of Wilbur-Ellis's success on the merits, the Court need not determine whether Wilbur-Ellis will ultimately succeed, but rather it must decide whether Wilbur-Ellis has a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008). To show it has a "fair chance of prevailing," Wilbur-Ellis need not show that it is more likely than not to prevail on the merits. *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (citing *Dataphase*, 640 F.2d at 113). Wilbur-Ellis only needs to establish that it has a fair chance of prevailing on one of its claims. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (citation omitted).

Relying on the Eighth Circuit's decision in *Miller v. Honkamp Krueger Financial Services Inc.*, 9 F.4th 1011 (8th Cir. 2021) ("*Miller v. Honkamp*"), Defendants argue that Wilbur-Ellis is not likely to succeed on the merits of the breach of contract claim because the Restrictive Covenants in Erikson's Employment Agreement cannot survive past the termination of the Agreement. Wilbur-Ellis disagrees, arguing that, unlike *Miller v. Honkamp*, Erikson's Agreement contains a survival provision permitting his obligations under the Restrictive Covenants to continue after termination of the Agreement.

The Agreement states that it shall be governed by South Dakota law. (Doc. 1-1, ¶ 17.) The parties agree that South Dakota law governs the Court's review of the Agreement. Under South Dakota law, interpretation of a contract is a question of law for the court. *Ziegler Furniture and Funeral Home, Inc. v. Cicmanec,* 709 N.W.2d 350, 354 (S.D. 2006) (citations omitted). Parties are bound by the plain terms of their contract. *See Coffey v. Coffey,* 888 N.W.2d 805, 809 (S.D. 2016). Courts possess no authority to rewrite a contract or add to its language. *Culhane v. W. Nat. Mut. Ins. Co.,* 704 N.W.2d 287, 297 (S.D. 2005) (quoting *American Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 160–62 (Tex. 2003)). "The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties." *Johnson v. Johnson,* 291 N.W.2d 776, 778 (S.D. 1980) (quoting *Huffman v. Shevlin,* 72 N.W.2d 852, 855 (S.D. 1955)). "Also, a contract must be construed as a whole, not just a detached portion of it." *Johnson,* 291 N.W.2d at 778 (citations omitted). Further, South Dakota courts do not "interpret language 'in a manner that renders a portion of [the contract] meaningless.'" *Tri-City Assocs., L.P. v. Belmont, Inc.,* 845 N.W.2d 911, 915 (S.D. 2014) (quoting *Estate of Fisher v. Fisher,* 645 N.W.2d 841, 846 (S.D. 2002)). Instead, a contract is interpreted to give "a reasonable and effective meaning to all [its] terms." *Id.* (quoting *Casey Ranch Ltd. P'ship v. Casey,* 773 N.W.2d 816, 821 (S.D. 2009)).

"When the meaning of contractual language is plain and unambiguous, construction is not necessary. If a contract is found to be ambiguous the rules of construction apply. Whether the language of a contract is ambiguous is . . . a question of law." *Ziegler Furniture,* 709 N.W.2d at 354. The mere fact that the parties differ on their interpretations of a contract does not create an ambiguity:

> A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract. Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.

*Dowling Family P'ship v. Midland Farms,* 865 N.W.2d 854, 860 (S.D. 2015) (quoting *Pesicka v. Pesicka,* 618 N.W.2d 725, 727 (S.D. 2000)).

Under South Dakota common law, courts may consider extrinsic evidence only when confronting an ambiguous contract provision, and courts are barred from using the evidence to

6

create an ambiguity to rewrite a contractual provision. *See LaMore Restaurant Group, LLC v. Akers*, 748 N.W.2d 756, 764–65 (S.D. 2008). *See also City of Watertown v. Dakota, Minnesota & Eastern R. Co.*, 551 N.W.2d 571, 576 (S.D. 1996) ("Parol evidence is not admissible where the agreement to be interpreted is integrated, unambiguous and the parties' intent is clear."). Accordingly, the Court first will address whether ambiguity exists with respect to whether the Restrictive Covenants in Erikson's Employment Agreement survive past the termination of the Agreement.

Wilbur-Ellis relies on the language in the survival provision at Section 21 of the Agreement which states that "the expiration or termination of this Agreement shall not be deemed a release or termination of any obligations of [Erikson], or rights of [Wilbur-Ellis], to the extent such obligations or rights, as the case may be, expressly survive the termination of the Agreement." Wilbur-Ellis highlights language in Sections 2 and 5 of the Agreement for the proposition that the parties expressly agreed that the Restrictive Covenants would survive the expiration of the Term of the Agreement.

Section 2 states that the Agreement is subject to a four-year term and that Erikson's employment "shall continue at will" following the expiration of the Term. Section 5 states that the non-compete and non-solicitation covenants are "for a period of two (2) years following the termination of [Erikson's] employment." Wilbur-Ellis argues this language unambiguously provides that the Restrictive Covenants begin to run at the end of Erikson's employment and not at the time the Agreement expires. Defendants disagree.

Defendants argue that, in order to trigger application of the survival clause in Section 21 to the Restrictive Covenants in Section 5, Section 5 of the Agreement must expressly state that the Restrictive Covenants survive termination of the Agreement; it is not enough to state that the Restrictive Covenants survive termination of Erikson's employment. Defendants assert that, because Section 5 lacks language expressly stating that the Restrictive Covenants survive termination of the Agreement, that means the parties did not intend the Restrictive Covenants to survive the termination of the Agreement.

In a perfectly written Agreement, Section 5 would state Erikson's non-compete and non-solicitation obligations survive the termination of the Agreement, or the survivor clause would specifically mention the non-compete and non-solicitation covenants as surviving termination of

7

the Agreement. However, the Court must follow South Dakota's rules of contract interpretation. That includes an obligation to "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation." *Lillibridge v. Meade Sch. Dist.*, 428 N.W.2d 428, 432 (S.D. 2008). The survival provision shows that the parties intended certain terms of the Agreement would continue to have effect after the Agreement was terminated. Non-competition and non-solicitation covenants are classic surviving obligations after termination of an employment contract. CITE Defendants do not point to any other provision in the Agreement which expressly states that it survives termination of the Agreement. "An interpretation which gives a reasonable and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable or of no effect." *Nelson v. Schellpfeffer*, 656 N.W.2d 740, 744 (S.D. 2003).

The Court concludes that the language of the Agreement is unambiguous even though the parties differ on their interpretations. Reading the Agreement in conformity with South Dakota's rules of contract interpretation, and giving effect to all provisions of the Agreement, the Court holds that the survival language of Section 21 must be viewed with reference to the language in Section 5 that Erikson agreed not to compete with Wilbur-Ellis or solicit its customers after his employment ended. The language shows that the parties intended the Restrictive Covenants to survive termination of the Agreement and to begin at termination of Erikson's employment. This interpretation gives reasonable and effective meaning to all of the terms in the Agreement and leaves no provision unreasonable or without effect. Any other interpretation would result in the survival language in Section 21 having no effect, and South Dakota law prohibits interpreting a contract in a manner that renders a portion of it meaningless. *See Tri-City*, 845 N.W.2d at 915.

The parties agree that there are no cases involving the same contract language at issue in this case, and the cases cited by the parties do not shed light on how the Court should interpret the Agreement in this case under South Dakota rules of contract interpretation. *Miller v. Honkamp* is distinguishable because the employment contract in that case did not contain a survival clause. Unlike here, there was no language in the *Miller v. Honkamp* contract from which the Eighth Circuit could conclude that the parties intended the non-compete provision to survive termination of the contract.

8

## B. Remaining Preliminary Injunction Factors

Wilbur-Ellis has also shown it will suffer irreparable harm in the absence of relief. The mere violation of non-compete and non-solicitation covenants suffices to show irreparable harm. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984). In *N.I.S.*, an insurance company brought an action to enjoin former sales agents from soliciting business from its policy-holders in violation of a restrictive covenant. The Eighth Circuit affirmed the district court's finding of the threat of irreparable harm based on evidence that the individual defendants were soliciting business from N.I.S.'s policyholders. *Id.* The Eighth Circuit reasoned:

> [i]f the noncompete agreements are valid, then we think an irreparable injury has been shown. As noted by the district court, the lack of a preliminary injunction would leave N.I.S. with the Hobson's choice of either filing a separate lawsuit for damages (or at least an amendment to an initial suit) each time one of the defendants solicited away another Ozark customer or waiting until Ozark's Alabama customers and goodwill had been completely drained away.

*Id.* The same is true in the present case. Erikson admitted that he is soliciting Wilbur-Ellis's customers. Erikson's continued violation of the Restrictive Covenants will cause Wilbur-Ellis to suffer some irreparable harm to its goodwill and established relationships. Erikson acknowledged this by entering into the Agreement, which states the following in paragraph 13:

> <u>Remedies</u>. Employee acknowledges that a violation of any of the provisions of this Agreement, including its restrictive covenants, will cause irreparable damage to Employer. . . . Employee consents that any violation shall entitle Employer . . . in addition to any other rights or remedies it . . . may have, to an immediate injunction restraining Employee from committing or continuing any violation of this Agreement. Employee will not assert any claim or defense in any action or proceeding to enforce any provision hereof that Employer has or had an adequate remedy at law.

(Doc. 1-1, ¶ 13.)

The public interest and balance of harms factors favor Wilbur-Ellis. Simplot argues that South Dakota's public policy generally prohibits contracts in restraint of trade, and Erikson asserts there is no public interest furthered by denying his continued employment. But because South Dakota law routinely enforces reasonable restrictive covenants, the public policy of South Dakota would be served by imposing an injunction to the extent necessary in this case. *See, e.g., Central, Inc. v. Morrow*, 489 N.W.2d 890 (S.D. 1992) (affirming trial court's injunction enjoining former employees from breaching noncompetition agreements).

The balance of harms factor requires this Court to weigh the severity of the impact on Erikson and Simplot should the injunction be granted against the hardship to Wilbur-Ellis should the injunction be denied. *See PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007). As noted above, to the extent Erikson has violated valid and enforceable Restrictive Covenants, Wilbur-Ellis will suffer some irreparable harm. In turn, Erikson and Simplot will suffer some harm if Erikson's solicitation of business is prohibited in the restricted area. But because Wilbur-Ellis has demonstrated a likelihood of success on the merits based on the evidence before the Court at this time, the balance of harms weighs in favor of Wilbur-Ellis.

## BOND

It its Brief Opposing Plaintiff's Request for Temporary Restraining Order, Simplot raised the issue of the bond requirement found in Rule 65(c) of the Federal Rules of Civil Procedure. (Doc. 23, pp.15-16.) Rule 65(c) provides in relevant part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c).

The purpose of the bond is to protect a defendant if later proceedings show it was wrongfully enjoined. *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770 n.14 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."); *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) ("Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully."); *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 373 (8th Cir. 1991) (ordering imposition of security "in an amount that fairly protects the [defendant] should it be ultimately found that the [defendant] has been wrongfully enjoined") (citing Fed.R.Civ.P. 65(c)). The amount of the bond is within the court's discretion. *Stockslager v. Carroll Elec. Co-op Corp.*, 528 F.2d 949, 951 (8th Cir. 1976).

Simplot requests a bond in the amount of $350,000.[1] (Doc. 23, p. 15.) This amount is based on the Declaration of Sam Caton, the Business Unit Director at Simplot. (Doc. 27.) Mr. Caton estimates that Simplot will suffer $145,500.00 in lost margin or profit if the Court were to grant a temporary restraining order:

> Based upon what Simplot would expect to be sold to Kevin Erikson's current customers, the lost margin or profit for sale of the herbicide used on the corn fields is expected to be approximately $77,500.00. The lost margin or profit for sale of the herbicide used on the soybeans is expected to be approximately $68,000.00. Combined, the total lost margin or profit is expected to be approximately $145,500.00.

(Doc. 27, ¶ 4.) In addition, Mr. Caton estimates a possible future loss of gross profits in the amount of $200,000 if Simplot loses customers because Erikson would be unable to communicate with them during the decision-making process. (*Id.*, ¶ 5.)

Erikson supports Simplot's request for a bond in the amount of $350,000, but Erikson is not making a separate request for himself. (Doc. 25, p. 12.) He states that any lost income or commissions of his would flow through Simplot. (*Id.*)

Wilbur-Ellis argues that the bond should be limited to one month of Erikson's base salary because it is not certain Erikson would earn certain commissions. (Doc. 32, pp. 9-10.) However, Erikson is not requesting a bond to secure his own potential financial harm.

The Court concludes that, while Wilbur-Ellis's likelihood of success on the merits appears strong now, the preliminary injunction will cause Simplot (and possibly Erikson) some financial harm. When the parties made their arguments regarding the amount of security they believe is necessary in this case, the parties were contemplating a TRO rather than a preliminary injunction. A preliminary injunction has no fixed time limit to run, while a TRO is limited in time. It is not known when this case can be scheduled for a trial on the merits. The Court will therefore order Wilbur-Ellis to post a bond as security for the preliminary injunction. Giving credence to the estimated losses to Simplot calculated by Mr. Caton, the Court will order a bond of $350,000 to provide adequate protection for Simplot's and Erikson's interests, subject to any adjustments the parties may prove are necessary at a later date.

---

[1] The Court assumes Simplot's request for a $300,000 bond in the Conclusion section of its brief is a mistake because every other reference is to $350,000.

11

## CONCLUSION

After applying the *Dataphase* factors, the Court holds that issuance of a preliminary injunction is appropriate in this case, and Wilbur-Ellis must post a bond in the amount of $350,000. Accordingly,

**IT IS ORDERED:**

1. That Wilbur-Ellis's motion for a preliminary injunction is granted. (Doc. 4.)

2. That Defendant Erikson is enjoined from the following acts set forth in the Restrictive Covenants in paragraph 5 of the Agreement:

   Erikson will not, within McCook County, South Dakota, and within a 100 mile radius of such county, for a period of two (2) years following the termination of his employment, directly or indirectly: (a) engage in any business engaged in the marketing, distribution, sale or application (or any segment thereof) of agricultural chemicals, fertilizers, seeds and related products (the "Competitive Business"), whether such engagement shall be as an owner, partner, employee, agent, consultant, or shareholder (except as the holder of not more than five percent (5%) of the outstanding shares of a corporation whose stock is listed on any national or regional securities exchange or any successor thereto) or in any other capacity; (b) solicit, divert or accept business from or otherwise take away or interfere with any customer of Employer or its affiliates or subsidiaries engaged in any Competitive Business, including without limitation, any person who was a customer of, or whose business was being pursued by, Employer in the conduct of its business prior to the date hereof; or (c) solicit the employment of any person employed by Employer or its affiliates or subsidiaries.

3. That the preliminary injunction does not apply to acceptance of unsolicited business. *See, e.g., Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1017 (8th Cir. 2021) (citing *1st Am. Sys., Inc. v. Rezatto*, 311 N.W.2d 51, 59 (S.D. 1981) (finding a restrictive covenant overbroad because it "plac[ed] an undue burden on appellee and the public to the extent that [it] prohibit[ed] accepting appellant's customers' business")). Erikson may accept unsolicited business in any location, including within McCook County, South Dakota, and within a 100 mile radius of McCook County.

4. That this preliminary injunction will remain in force until a hearing is held and the Court rules on the permanent injunction, or until further order of this Court.

5. That, pursuant to Federal Rule of Civil Procedure 65(c), this preliminary injunction shall be effective upon Wilbur-Ellis posting a bond in the amount of Three Hundred Fifty Thousand Dollars ($350,000).

Dated this 13th day of June, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK